IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE DISTRICT OF SOUTH CAROLINA
ROCK HILL DIVISION

| | | |
|---|---|---|
| ThrivePoint Medical Laboratories, LLC,<br><br>Plaintiff,<br><br>v.<br><br>Westminster Presbyterian Center, Inc. *d/b/a Westminster Assisted Living, Independent Living, Long-Term Care*,<br><br>Defendant. | ) | Case No. 0:23-cv-04052-JDA<br><br>**OPINION AND ORDER** |

This matter is before the Court on a motion for summary judgment filed by Defendant Westminster Presbyterian Center, Inc. ("Westminster"). [Doc. 100.]

Plaintiff ThrivePoint Medical Laboratories, LLC ("ThrivePoint") filed an Amended Complaint on August 15, 2025, asserting claims against Westminster for violation of the South Carolina Unfair Trade Practices Act ("SCUTPA"), breach of contract, and unjust enrichment.[1] [Doc. 97.] On October 29, 2025, Westminster moved for summary judgment. [Doc. 100.] ThrivePoint filed a response on December 5, 2025, and Westminster filed a reply on December 19, 2025.[2] [Docs. 106; 110; *see* Docs. 105; 111.] Accordingly, this motion is ripe for review.

---

[1] The Amended Complaint also originally included claims against Blue Cross Blue Shield of South Carolina, Inc. and BlueChoice HealthPlan of South Carolina, Inc. (collectively, "BCBSSC") [Doc. 97 ¶¶ 136–67], but BCBSSC was voluntarily dismissed from this case on October 29, 2025 [Doc. 101].

[2] On September 2, 2026, the Court directed the parties to file supplemental briefing regarding an argument by Westminster that ThrivePoint has not forecasted sufficient evidence on damages as to its breach of contract claim. [Doc. 113; *see* Docs. 118; 137.]

## BACKGROUND[3]

In ruling on a motion for summary judgment, this Court reviews the facts and reasonable inferences in the light most favorable to the nonmoving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007); *see also Hardwick ex rel. Hardwick v. Heyward*, 711 F.3d 426, 433 (4th Cir. 2013).

**The Parties' Introduction and Their Entry into a Contract**

This dispute arises over a contract between ThrivePoint and Westminster. Westminster is a South Carolina corporation that operates a retirement home, long-term care facility ("LTCF"), skilled nursing facility ("SNF"), and rehabilitation center in Rock Hill, South Carolina. [Docs. 97 ¶ 2; 99 ¶ 2.] ThrivePoint was a North Carolina limited liability company providing medical testing services that was organized and existed pursuant to the laws of the State of North Carolina. [Docs. 97 ¶ 1; 99 ¶ 1; 100-4.]

In March 2020, a public health emergency was declared by the State of South Carolina and the United States federal government concerning COVID-19. [Doc. 31 at 2.] ThrivePoint subsequently solicited Westminster, offering to provide COVID-19 testing services. [Docs. 100-3 at 7 (23:11–17), 8 (25:11–16); 100-4.] Following marketing presentations and phone calls, ThrivePoint drafted and presented Westminster with a

[3] The Court notes that Westminster did not file a separate statement of material facts with its summary judgment motion, as required by the undersigned's Rule 56 Summary Judgment Motion Procedures, https://www.scd.uscourts.gov/Forms/Scheduling_Orders/Austin_Rule_56.docx. On the other hand, ThrivePoint did file an opponent's statement of material facts, in which it addressed factual assertions in Westminster's initial brief in support of its summary judgment motion to the extent those factual assertions were accompanied by record citations. [Doc. 105.] Westminster then filed a reply statement of material facts. [Doc. 111.] The Court will cite to these documents and their attachments for the relevant background included herein.

contract that ThrivePoint and Westminster executed on August 15, 2020 (the "Contract"). [Docs. 100-2; 100-3 at 9 (31:2–11).]

The entirety of the Contract states:

> [Westminster] hereby request[s] laboratory services of [ThrivePoint] to process laboratory specimens for analysis of patients, residents and employees. These samples may be collected by [ThrivePoint] or [Westminster].
>
> [Westminster] understands that [ThrivePoint] will submit billing to medical insurances for payment of services. [Westminster] further understands that uninsured claims will be submitted to the government HRSA Healthcare Enhancement Act for payment. [Westminster] understands that the provision for the uninsured may be discontinued in the future by the government authorities. [ThrivePoint] will notify [Westminster] if this occurs.
>
> This agreement gives [ThrivePoint] authorization from [Westminster] to provide services to patients, residents, and employees of [Westminster] including onsite services if necessary. [ThrivePoint] will be responsible for laboratory collection supplies and shipping or pickup of collection. [ThrivePoint] will operate its hours to ensure a 48-hour turnaround period from receiving samples. Reporting of results will be via portal, fax, telephone call or any method requested by [Westminster].
>
> [Westminster] understands that complete and accurate demographics will be needed for each patient, resident, and employee to be in compliance with government and insurance policies and billing compliance.
>
> [Westminster] understands that [ThrivePoint] compl[ies] and operate[s] under the policies and procedures of Medicare.

> [ThrivePoint's] mission and commitment is to assist in the best patient care with accuracy and quick turnaround time[.]
>
> This agreement and authorization of services can be terminated by either party with a complimentary 30-day notice.

[Doc. 100-2.]

ThrivePoint performed polymerase chain reaction ("PCR") COVID-19 testing under the Contract beginning in August 2020. [Docs. 97 ¶ 26; 105 at 10.] On September 2, 2020, about two and a half weeks after the Contract was executed, the Centers for Medicare and Medicaid Services ("CMS") issued an interim final rule requiring that long-term care facilities like Westminster regularly test all their residents and facility staff for COVID-19. *See* Medicare and Medicaid Programs, Clinical Laboratory Improvement Amendments (CLIA), and Patient Protection and Affordable Care Act; Additional Policy and Regulatory Revisions in Response to the COVID-19 Public Health Emergency, 85 Fed. Reg. 54,820, 54,851–53 (Sept. 2, 2020). Accordingly, at Westminster's direction, ThrivePoint regularly tested the employees, residents, and patients that Westminster selected. [Docs. 100-6 at 5 (16:15–18); 105-6 at 26 (66:2–24), 28 (68:7–19), 29–32 (69:1–72:20).]

**Medicare and its Application to Westminster**

Persons enrolled in Medicare receive services generally classified as Part A or Part B. "Medicare Part A is also known as hospital insurance and covers inpatient hospital stays, care in a [SNF], hospice care, and some home health care." [Doc. 31 at 3 n.3.]

Medicare Part B covers certain doctors' services, outpatient care, medical supplies, and preventative services." [*Id.* at 3 n.4.]

Westminster explains how the services at its facilities were covered by Parts A and B:

> Part A services [we]re generally for patients who [we]re in a qualified Part A inpatient stay. Part A patients ma[d]e up the smaller class of Medicare beneficiaries at Westminster's facility, and generally []encompass[ed] receiving rehab[ilitation] skilled nursing care. Part B services [we]re outpatient services. This larger class of Medicare beneficiaries at the facility [were] persons who were Medicare beneficiaries and residents at the facility — essentially, any Medicare patient or resident who was not in a Part A covered stay.

[Doc. 100-1 at 8.]

Westminster's "health center" was a three-floor, 66-bed SNF, of which 22 beds are Medicare certified for health and rehabilitation. [Doc. 105-11 at 7–8; Doc. 105-4 at 7–8 (15:15–16:25).] Westminster was responsible, under Medicare regulations, to pay for any care delivered to these Part A patients by outside service providers.[4] [Docs. 105-4 at 15–16 (23:11–24:22), 21–22 (29:15–30:25), 55–56 (63:16–64:15), 105-11 at 6–7.]

**Testing, Reimbursement Denials, and the Consequences**

ThrivePoint began providing testing under the Contract in August 2020. [Docs. 97 ¶ 26; 105 at 12.] Prior to testing a particular person, ThrivePoint collected an intake form with the person's demographic information, including their insurance information.

[4] Unlike Medicare Part B, Medicare Part A prohibited direct payments from Medicare to service providers. [Doc. 105-4 at 23–24 (31:19–32:4), 60 (68:10–19), 62 (70:6–21); *see also id.* at 24–29 (32:11–37:8).]

[Docs. 100-3 at 33 (82:16–25); 100-6 at 6 (18:16–23); 100-11.] Then ThrivePoint sought reimbursement from Medicare and private insurance. [Doc. 105 at 8.]

After several months of testing, on December 7, 2020, ThrivePoint wrote to Westminster that "Medicare [had] determined they will not pay for testing directly to [ThrivePoint] because Westminster receives CMS payment allocated specifically for expected PCR testing via/with bundled billing and/or CARES ACT to nursing homes."[5] [Doc. 100-15.] When ThrivePoint asked Westminster whether it agreed with CMS's payment determination, Westminster claimed Medicare had "'made a mistake,'" and Westminster directed ThrivePoint to appeal Medicare's denials. [Doc. 105-2 at 36 (71:7–9).]

ThrivePoint was also unsuccessful receiving payment from BCBSSC for its testing of Westminster's employees. [Doc. 105 at 6.] BCBSSC's policy was that medical necessity for coverage of COVID-19 tests was to be determined only by an individual evaluation by a healthcare provider. [Docs. 105-9 at 3–7 (32:21–36:23); 105-30]. BCBSSC denied coverage for ThrivePoint's COVID-19 tests of Westminster employees on the basis that the tests were "employee screening," i.e., not "medically necessary because the tests were conducted to screen for general workplace health and safety and/or for public health surveillance." [Docs. 105-9 at 15–16 (99:9–100:3), 18 (102:6–

---

[5] The Coronavirus Aid, Relief, and Economic Security Act ("CARES Act") "appropriated $100 billion 'to prevent, prepare for, and respond to coronavirus, domestically or internationally, for necessary expenses to reimburse, through grants or other mechanisms, eligible health care providers for health care related expenses or lost revenues that are attributable to coronavirus.'" Congress.gov/The Provider Relief Fund: Frequently Asked Questions, available at https://www.congress.gov/crs-product/R46897#ifn3 (last accessed Oct. 29, 2026) (quoting P.L. 116-136, 134 Stat. 563). "These funds were appropriated to the . . . 'Provider Relief Fund.'" *Id.*

24), 19–20 (103:14–104:5); 105-14 at 14–15; 105-10 at 3 (24:4–15), 6–7 (50:14–51:11).] Additionally, under the CARES Act, ThrivePoint was not allowed to "balance bill" BCBSSC's individual insureds for the COVID-19 testing: the only possible parties who could be required to pay for COVID-19 testing of Westminster's employees were BCBSSC or the employer, Westminster. [Doc. 105-9 at 14 (98:6–23).]

In light of these circumstances, ThrivePoint sought payment from Westminster. [Docs. 100-23; 105-34.] However, Westminster also refused to pay, asserting that any payment under the Contract must be obtained from third parties and that Westminster had not guaranteed that ThrivePoint would be successful in obtaining such payment. [Docs. 105-11 at 15; 105-34.] In all, ThrivePoint contends that it did not receive reimbursement for 3,502 tests on Westminster's employees and 1,935 tests on Westminster's residents and patients. [Doc. 105 at 4.]

After the conclusion of its relationship with ThrivePoint, Westminster briefly conducted its own COVID-19 testing using rapid tests. [Doc. 100-16 at 6–7 (61:22–62:4).] However, in April 2021, Westminster contracted with another company, Andor Labs, LLC ("Andor") to perform its COVID-19 testing under a contract that explicitly provided that Andor would not bill Westminster for any testing. [Doc. 105-4 at 120 (180:14–18); 105-27.]

ThrivePoint eventually went out of business due to insolvency caused by the heavy losses it suffered from its unreimbursed work under the Contract. [Doc. 105-2 at 4 (12:17–12:20), 5 (15:12–15).] ThrivePoint was administratively dissolved by the North Carolina Secretary of State prior to the filing of the Complaint. [Doc. 100-3 at 50–51.]

**This Action**

On August 15, 2023, ThrivePoint brought this action, and on August 15, 2025, filed an Amended Complaint. [Docs. 1; 97.] As previously stated, the claims currently pending are for breach of contract, unjust enrichment, and violation of the SCUTPA. [Doc. 97 ¶¶ 116–35, 153–67.] As relief, ThrivePoint seeks actual, consequential, treble, and punitive damages; attorneys' fees; costs; and interest. [*Id.* at 36.]

## APPLICABLE LAW

Rule 56 of the Federal Rules of Civil Procedure states, as to a party who has moved for summary judgment:

> The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.

Fed. R. Civ. P. 56(a). A fact is "material" if proof of its existence or non-existence would affect disposition of the case under applicable law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). An issue of material fact is "genuine" if the evidence offered is such that a reasonable jury might return a verdict for the non-movant. *Id*. at 257. When determining whether a genuine issue has been raised, the court must construe all inferences and ambiguities against the movant and in favor of the non-moving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962).

The party seeking summary judgment shoulders the initial burden of demonstrating to the court that there is no genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the movant has made this threshold demonstration, the non-moving party, to survive the motion for summary judgment, may not rest on the allegations averred in his pleadings. *Id*. at 324. Rather, the non-moving party must demonstrate

specific, material facts exist that give rise to a genuine issue. *Id*. Under this standard, the existence of a mere scintilla of evidence in support of the non-movant's position is insufficient to withstand the summary judgment motion. *Anderson*, 477 U.S. at 252. Likewise, conclusory allegations or denials, without more, are insufficient to preclude granting the summary judgment motion. *Id*. at 248. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id*. Further, Rule 56 provides in pertinent part:

> A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
>
> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1). Accordingly, when Rule 56(c) has shifted the burden of proof to the non-movant, he must produce existence of a factual dispute on every element essential to his action that he bears the burden of adducing at a trial on the merits.

## DISCUSSION

Westminster argues it is entitled to summary judgment on all claims asserted against it. [Docs. 100; 100-1.] The Court addresses the claims seriatim.

### Breach of Contract Claim

The Court begins with ThrivePoint's breach of contract claim. The Amended Complaint alleges that Westminster breached the Contract in at least three ways:

> by failing to (a) provide ThrivePoint with accurate demographics for its residents and patients, (b) communicate accurate information regarding whether its residents and/or patients were covered by either Medicare Part A or Medicare Part B, and (c) acknowledge and observe its responsibility to include services rendered by ThrivePoint in the bill that Westminster submitted to Medicare Part A and remit to ThrivePoint a portion of the Medicare payments received by Westminster.

[Doc. 97 ¶ 131.]

Westminster argues that it is entitled to summary judgment on this claim because the Contract unambiguously does not require Westminster to pay ThrivePoint for testing. [Doc. 100-1 at 12–14.] The Court agrees with Westminster that the Contract does not require Westminster to pay ThrivePoint for testing, but the Court does not agree that this point supports awarding summary judgment to Westminster on the entire breach of contract claim.

The Court begins by noting that the elements for breach of contract under South Carolina law[6] are (1) the existence of a contract, (2) its breach, and (3) damages caused by such breach. *Fuller v. E. Fire & Cas. Ins.*, 124 S.E.2d 602, 610 (S.C. 1962); *Branche Builders, Inc. v. Coggins*, 686 S.E.2d 200, 202 (S.C. Ct. App. 2009). "Where an agreement is clear on its face and unambiguous, the court's only function is to interpret its lawful meaning and the intent of the parties as found within the agreement." *Stevens & Wilkinson of S.C., Inc. v. City of Columbia*, 762 S.E.2d 696, 700 (S.C. 2014) (internal quotation marks omitted). "Interpretation of a contract is governed by the objective manifestation of the parties' assent at the time the contract was made, rather than the

---

[6] "A federal court sitting in diversity or supplemental jurisdiction generally applies the relevant substantive law of the state in which the court sits." *Prysmian Cables & Sys. USA, LLC v. Szymanski*, 573 F. Supp. 3d 1021, 1036 n.5 (D.S.C. 2021).

subjective, after-the-fact meaning one party assigns to it." *N. Am. Rescue Prods., Inc. v. Richardson*, 769 S.E.2d 237, 241 (S.C. 2015) (internal quotation marks omitted). "Where the contract language is plain and capable of legal construction, that language alone determines the instrument's force and effect." *Stevens & Wilkinson*, 762 S.E.2d at 700. Whether contract language is ambiguous is a question of law for the court. *Fludd v. S. State Bank*, 566 F. Supp. 3d 471, 487 (D.S.C. 2021).

The subjects addressed by this one-page Contract are few. It provides Westminster's general authorization for ThrivePoint to test Westminster's residents, patients, and employees, and it provides obligations on the respective parties concerning the particular testing that occurs. [Doc. 100-2.] However, the Contract does not grant ThrivePoint the exclusive right to conduct testing on Westminster's residents, patients, and employees. It also does not obligate ThrivePoint to test any particular person or classes of persons, nor does it specify how often the testing must occur. The only specific obligation the Contract places on Westminster is it must provide "complete and accurate demographics . . . for each patient, resident, and employee."[7] [*Id.*]

---

[7] In contrast, ThrivePoint's obligations were much more extensive. ThrivePoint had to "submit billing to medical insurances for payment of services." [Doc. 100-2.] ThrivePoint was also required to submit uninsured claims "to the government HRSA Healthcare Enhancement Act for payment," although the Contract acknowledges "that the provision for the uninsured may be discontinued in the future by the government authorities" and requires ThrivePoint to notify Westminster if such a discontinuance occurred. [*Id.*] The Contract also made ThrivePoint "responsible for laboratory collection supplies and shipping or pickup of collection," and ThrivePoint was required to "operate its hours to ensure a 48-hour turnaround period from receiving samples" and to report results "via portal, fax, telephone call or any method requested by" Westminster. [*Id.*] Finally, ThrivePoint was required to "comply and operate under the policies and procedures of Medicare" and "assist in the best patient care with accuracy and quick turnaround time." [*Id.*]

ThrivePoint argues that the Contract can be reasonably read to impose broader obligations on Westminster. ThrivePoint specifically points to the language stating that "Westminster understands that ThrivePoint complies and operates under the policies and procedures of Medicare." [Doc. 106 at 26 (internal quotation marks omitted).] From ThrivePoint's standpoint, that language, though mentioning only ThrivePoint, creates a contractual obligation on Westminster as well. [*Id.*] ThrivePoint also argues that the rules concerning Medicare Plan A preclude service providers from directly billing Medicare and require the SNF to pay the service provider. [*Id.* at 26–28.] ThrivePoint therefore argues that to the extent that Westminster did otherwise, it would violate not only the Medicare rules but also the Contract. [*Id.* at 26–31.]

The Court disagrees. Whatever Westminster's obligations were under the Medicare rules, nothing in the Contract's language could be reasonably understood to turn such regulatory obligations into contractual ones.[8]

ThrivePoint also argues that interpreting the Contract not to require Westminster to pay ThrivePoint for testing defies common sense because a service provider would never agree to provide testing without a guarantee of payment. [*Id.* at 29.] The Court sees no reason why that would be true. The opportunity to perform testing and bill third parties for those services could well have been of significant value to ThrivePoint even without the additional security of a guarantee of payment from Westminster. There is no reason the Court would ignore the possibility that ThrivePoint determined that any risk

---

[8] As Westminster points out, there is no private right of action for a violation of Medicare rules. [Doc. 110 at 7–8 (citing *Alexander v. Sandoval*, 532 U.S. 275, 296 (2001), for the proposition that "private rights of action to enforce federal law must be created by Congress").]

that it would not be paid was outweighed by the opportunity to make a substantial profit if events worked out as ThrivePoint hoped.[9]

The issues not addressed by the Contract confirm Westminster's contention that it never agreed to pay for testing. In particular, the Contract never provides a price for the tests, identifies terms of payment, states how default would occur, explains any penalty for failure to make payment, limits the number of tests or people to be tested by ThrivePoint, or guarantees payment for the claims made to insurance companies or Medicare. Particularly in the absence of any language specifying a price that Westminster would pay for ThrivePoint's services, the language ThrivePoint identifies cannot reasonably be read to create any payment obligation on the part of Westminster. *See McGill v. Moore*, 672 S.E.2d 571, 574 (S.C. 2009) (holding that a contract is read as a whole document such that one cannot create an ambiguity by pointing out a single sentence or clause). For that reason, the Court grants Westminster's summary judgment motion on the breach of contract claim to the extent the claim is based on Westminster's refusal to pay for the testing.

However, Westminster's argument on summary judgment does not address the other basis for the breach of contract claim, particularly, the allegation that Westminster breached by failing to "provide ThrivePoint with accurate demographics for its residents and patients" and "communicate accurate information regarding whether its residents and/or patients were covered by either Medicare Part A or Medicare Part B." [Doc. 97

[9] Moreover, the Court notes that Andor accepted the very arrangement that ThrivePoint contends a service provider would never accept. [Doc. 105-27.]

¶ 131.] The Court therefore denies Westminster's summary judgment motion on the breach of contract claim to the extent the claim is based on that theory.[10]

**Unjust Enrichment Claim**

The Court next turns to ThrivePoint's unjust enrichment claim, which is based on ThrivePoint's alleged conferral of a benefit on Westminster through the provision of testing and Westminster's retention of that benefit without paying the reasonable value of the services ThrivePoint performed. [*Id.* ¶¶ 153–67.] Westminster argues that ThrivePoint's claim for unjust enrichment fails because ThrivePoint cannot recover damages for equitable relief when all tests were performed under a valid contract. [Doc. 100-1 at 15–17.] The Court disagrees.

"Unjust enrichment is an equitable doctrine which permits the recovery of that amount the defendant has been unjustly enriched at the expense of the plaintiff." *Dema v. Tenet Physician Servs.-Hilton Head, Inc.*, 678 S.E.2d 430, 434 (S.C. 2009). To succeed on an unjust enrichment claim, a plaintiff must prove that he conferred a non-gratuitous benefit on the defendant "(1) at the defendant's request or (2) in circumstances where the plaintiff reasonably relies on the defendant to pay for the benefit and the defendant understands or ought to understand that the plaintiff expects compensation and looks to him for payment." *Jones v. Duke Energy Corp.*, No. 3:24-1281-MGL, 2025 WL 2243769, at *7 (D.S.C. Aug. 6, 2025) (internal quotation marks omitted).

[10] The Court notes that Westminster argues that it is also entitled to summary judgment on ThrivePoint's breach of contract claim because ThirvePoint has failed to forecast sufficient evidence concerning damages. [Doc. 100-1 at 22–23.] The Court concludes, however, that ThrivePoint has forecast evidence sufficient to create a genuine dispute of material fact as to damages.

"While parties are permitted under South Carolina law to pursue quasi-contractual claims when there is no valid contract between the parties[,] . . . when the parties agree . . . that a valid and enforceable contract exists which covers the dispute between them, [the equitable claims] are superfluous." *Boldt Co. v. Thomason Elec & Am. Contractors Indem. Co.*, 820 F. Supp. 2d 703, 707 (D.S.C. 2007); *see also Swanson v. Stratos*, 564 S.E.2d 117, 120 (S.C. Ct. App. 2002) (stating that a plaintiff may not seek compensation under an unjust enrichment theory for a payment encompassed in a contract that has not been abandoned or rescinded); *Atherton v. Tenet Healthcare Corp.*, No. 2005-UP-362, 2005 WL 7084013, at *6 (S.C. Ct. App. May 25, 2005) (dismissing the plaintiff's claim for unjust enrichment when the plaintiff "merely attempt[ed] to reframe his breach of contract action as an action for unjust enrichment," holding the express contract precluded the plaintiff's claim for unjust enrichment).

ThrivePoint argues that the Contract does not bar the unjust enrichment claim because the Contract is voidable or otherwise unenforceable based on mutual mistake and illegality. [Doc. 106 at 33.] Specifically, ThrivePoint contends that at the time the parties entered their agreement, they "shared a mutual mistake of fact regarding the policies of Medicare (CMS) and BCBSSC for paying for COVID-19 testing." [*Id.*] ThrivePoint also argues that to the extent the Contract required ThrivePoint to bill Medicare for its services for SNF Part A Patients—Westminster's patients—the Contract was void ab initio and unenforceable as violating the applicable Medicare rules. [*Id.*]

ThrivePoint is correct that a contract may be voidable when it is based upon mutual mistake of material fact. *See Truck S., Inc. v. Patel*, 528 S.E.2d 424, 429 (S.C. 2000); *see also* Restatement (Second) of Contracts §§ 151 ill. 3; 152 ill. 7 (1981). Further, the

Court concludes that there is a genuine dispute of material fact as to whether the Contract is voidable based on the parties' mutual mistaken belief that ThrivePoint could bill the government directly for Westminster's SNF Medicare Part A Patients. The Court therefore denies Westminster's summary judgment motion as to the unjust enrichment claim.[11]

**SCUTPA Claim**

Finally, the Court addresses ThrivePoint's SCUTPA claim. ThrivePoint bases this claim on Westminster's refusal to pay ThrivePoint for testing despite Westminster accepting significant money from the Provider Relief Fund and on its refusal to pay Andor for the testing Andor provided Westminster. [Doc. 97 ¶¶ 116–25.] Westminster contends that no evidence supports ThrivePoint's SCUTPA cause of action. [Doc. 100-1 at 17–21.] The Court agrees.

To establish a violation of the SCUTPA, a "plaintiff must show: (1) the defendant engaged in an unfair or deceptive act in the conduct of trade or commerce; (2) the unfair or deceptive act affected public interest; and (3) the plaintiff suffered monetary or property loss as a result of the defendant's unfair or deceptive act(s)." *Wright v. Craft*, 640 S.E.2d

[11] Westminster argues that ThrivePoint's tests did not confer a benefit on Westminster as Westminster could have performed the test on its own had ThrivePoint not performed them. [Doc. 100-1 at 16.] The Court concludes, however, that a genuine dispute of material fact exists as to whether Westminster received a benefit from the testing. Westminster alternatively argues that it has not been unjustly enriched by the testing because the terms of the Contract established that Westminster would receive the testing without being obligated to pay for it. [*Id.*] However, a reasonable jury could conclude that—at least regarding Westminster's payments—the favorable deal that Westminster struck was based on the parties' mutual mistake in believing that ThrivePoint could file claims with Medicare for the testing and that it would be inequitable under the circumstances to allow Westminster to retain the full benefit of the testing at ThrivePoint's expense.

486, 498 (S.C. Ct. App. 2006). "An unfair trade practice has been defined as a practice which is offensive to public policy or which is immoral, unethical, or oppressive." *deBondt v. Carlton Motorcars, Inc.*, 536 S.E.2d 399, 407 (S.C. Ct. App. 2000).

Westminster argues that ThrivePoint's SCUTPA claim fails for several reasons. [Doc. 100-1 at 17–21.] The Court focuses on Westminster's claim that ThrivePoint has failed to forecast evidence that Westminster performed an unfair or deceptive act. [*Id.* at 17–20.] In its response, ThrivePoint identifies two types of allegedly unfair or deceptive acts by Westminster—first, Westminster's refusal to use any of its Provider Relief Funds and Medicare per diem payments to pay ThrivePoint (the "Reimbursement Allegations"), and second, inducing Andor to perform COVID-19 diagnostic testing under terms similar to those in the Contract (the "Andor Allegations"). [Doc. 106 at 9–10.]

Addressing the Andor Allegations first, the Court notes that Westminster's inducing Andor to provide free COVID-19 tests could not be the basis for a viable SCUTPA claim for ThrivePoint because there is no evidence that Westminster's relationship with Andor harmed ThrivePoint. *Wright*, 640 S.E.2d at 498.

ThrivePoint fares no better with the Reimbursement Allegations. ThrivePoint asserts that Westminster received $586,396 in Provider Relief Funds. [Doc. 106 at 10.] ThrivePoint contends that the law required Westminster to use the Provider Relief Funds for health care-related expenses or lost revenues attributable to COVID-19 but that Westminster improperly used at least some of those funds for other purposes. [*Id.* at 10–17.] ThrivePoint argues that Westminster acted deceptively in refusing to use some of the funds to pay ThrivePoint for the health care expense Westminster incurred for testing. [*Id.* at 11.] The Court does not agree that ThrivePoint's identified theory is legally viable.

Even assuming arguendo that ThrivePoint is correct that Westminster used some of its Provider Relief Funds improperly, ThrivePoint cannot show that Westminster acted unfairly or deceptively in refusing to pay any of the funds *to ThrivePoint*. As the Court has discussed, given that Westminster was not contractually obligated to pay for the testing services ThrivePoint provided under the Contract, Westminster did not incur any expense for this testing that the Provider Relief Funds could have been used to reimburse.

For all of these reasons, the Court grants summary judgment to Westminster on ThrivePoint's SCUTPA claim.[12]

## CONCLUSION

For these reasons, Westminster's motion for summary judgment [Doc. 100] is GRANTED IN PART and DENIED IN PART. The motion is granted as to ThrivePoint's breach of contract claim to the extent it is based on Westminster's refusal to pay ThrivePoint for testing but otherwise denied as to that claim; granted regarding ThrivePoint's SCUTPA claim; and denied as to ThrivePoint's unjust enrichment claim.

IT IS SO ORDERED.

s/ Jacquelyn D. Austin
United States District Judge

November 5, 2026
Columbia, South Carolina

[12] Because the Court resolves Westminster's motion as to the SCUTPA claim on this basis, the Court declines to address Westminster's alternative arguments. [Doc. 100-1 at 17–21.]